# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

| | |
|---|---|
| MIKE RHODES, | ) |
|     Plaintiff, | ) |
| v. | )     No. 1:19-cv-01030-STA-jay |
| BATES RUBBER, INC.; PARK-OHIO HOLDINGS CORP; PARK OHIO ASSEMBLY COMPONENTS GROUP; PARK OHIO INDUSTRIES, INC.; FLUID ROUTING SOLUTIONS, LLC; SUPPLY TECHNOLOGIES, LLC; and PAMELA McDANIEL (individually), | ) |
|     Defendants. | ) |

___

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
___

Before the Court is Defendants Bates Rubber, Inc.; Fluid Routing Solutions, LLC; Park Ohio Assembly Components Group; and Supply Technologies, LLC's Motion to Dismiss (ECF No. 8) filed on February 21, 2019. Defendants seek the partial dismissal of the Complaint against them. Defendants argue that Plaintiff Mike Rhodes fails to state two of his claims for relief: the intentional infliction of emotional distress and a claim for punitive damages for the violation of the Tennessee Human Rights Act. Rhodes has responded in opposition, and Defendants have filed a reply. For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED**.

## BACKGROUND

**I. Factual Allegations**

Rhodes's Complaint (ECF No. 1-2) alleges claims for age discrimination in violation of the Tennessee Human Rights Act ("the THRA") against his former employer Bates Rubber, Inc. and several other related corporate entities: Fluid Routing Solutions, LLC; Park Ohio Assembly

1

Components; Supply Technologies, LLC; Park-Ohio Holdings Corp.; and Park-Ohio Industries, Inc. (collectively, "the Employer Defendants"). The Complaint further alleges a claim under Tennessee common law for the intentional infliction of emotional distress and outrageous conduct ("IIED") against the Employer Defendants and Rhodes's former plant manager, Pamela McDaniel, in her individual capacity. The Court accepts the following well-pleaded factual allegations as true at this stage of the proceedings.

Plaintiff Mike Rhodes is a former employee of Bates Rubber, Inc. in Lobelville, Tennessee. (Compl. ¶ 2.) Rhodes had been employed at Bates Rubber since 1995. (*Id*. ¶ 23.) Rhodes was 59 years old at the time of his termination and therefore belonged to a class of individuals over the age of 40 who are protected from age discrimination under the THRA. (*Id*. ¶ 7.) Pamela McDaniel was the plant manager at Bates Rubber and had been Rhodes's direct supervisor since 2017. (*Id*. ¶¶ 16, 18.) Defendant Ohio Park Holdings Corporation acquired Bates Rubber in 2013 and initiated a pattern and practice of age discrimination against older employees. (*Id*. ¶ 26.) The Complaint describes a series of incidents in which older employees received discipline and demotions and eventually lost their jobs as part of this pattern, allegations which are supported by affidavits from two of the affected employees, David Weston and Tim O'Guin. *See* Weston Aff., ex. A to Compl., O'Guin Aff., ex. B to Compl. The Complaint alleges that McDaniel was generally "abrasive and rude" to Rhodes and other older plant employees. (*Id*. ¶¶ 40, 61.) McDaniel made age-related comments and treated older employees with condescension, for example, by speaking to them loudly and slowly. (*Id*. ¶ 41.) McDaniel also let it be known that she preferred to eliminate older employers who had more seniority, higher salaries, and greater accrued benefits like paid time off. (*Id*. ¶ 46.)

The Complaint alleges that prior to Rhodes's termination, McDaniel replaced one older supervisor at the plant with a younger employee named Scott Cude. (*Id*. ¶ 43.) Cude, who is not a party to this action, made remarks to Rhodes about his "old man shirts" and put the word out around

2

the plant that McDaniel was looking for a way to get rid of Rhodes, because Rhodes supposedly made too much money and used too much vacation time. (*Id*. ¶ 44.) The Complaint alleges that McDaniel also made a number of comments to other plant employees about her view of Rhodes. McDaniel once described Rhodes to another management employee as "nothing but a stupid-ass old hillbilly." (*Id*. ¶ 62.) McDaniel also made comments that Rhodes "needed to go" because he made "too much money" and took four weeks of vacation a year. (*Id*. ¶ 63.) The Complaint adds that Defendants implemented a "use it or lose it" policy for accrued time off, which had a detrimental effect on older employees like Rhodes who were entitled to more vacation time because of their seniority. (*Id*. ¶ 68.)

The Complaint alleges that McDaniel's discriminatory treatment of Rhodes came to a head in 2018 and resulted first in his demotion as a supervisor and then in his termination. In September 2018, McDaniel summoned Rhodes and another plant employee to a brief meeting at which time she informed Rhodes she was demoting him from his position as a supervisor. (*Id*. ¶ 71.) Rhodes, who did not immediately challenge the decision, had no other notice of the demotion and had no reason to believe that his performance merited a demotion. (*Id*. ¶ 75.) Then a few weeks later in October 2018, Rhodes was placed on leave and ultimately fired for an alleged violation of company policy. On October 4, 2018, Rhodes had approached Marty Bullock, a welder at the plant, and asked for his help in repairing a small metal bracket Rhodes had brought from home. (*Id*. ¶ 87.) According to the Complaint, there was a long-standing custom at the plant of welders assisting other plant employees with personal repair jobs that a welder could complete off the clock during a regularly-scheduled, 30-minute break. (*Id*. ¶ 84.) Scott Cude, who was not Rhodes's supervisor, observed Rhodes speaking with the welder and reported it to McDaniel. (*Id*. ¶¶ 89, 90.) McDaniel approached Rhodes and the welder about their activities and then directed human resources to take statements from each. (*Id*. ¶ 91.) Human resources, at McDaniel's direction, advised Rhodes he was being placed on administrative leave for working on personal matters on company time. (*Id*.) Rhodes was permitted

3

to retrieve two personal items from his desk and then escorted from the plant. (*Id*. ¶ 96.) Rhodes was informed six days later that his employment was being terminated. (*Id*. ¶ 100.) Upon his termination, Rhodes applied for unemployment benefits, which Defendants contested during administrative proceedings.

**II. Procedural History**

Rhodes originally filed suit in the Circuit Court for Perry County, Tennessee, on January 15, 2019. Defendants removed the suit to federal court and filed their Notice of Removal (ECF No. 1) on February 14, 2019. Defendants alleged in their Notice of Removal that this Court had jurisdiction under 28 U.S.C. § 1332(a) based on the amount in controversy and the complete diversity of citizenship of the parties. Defendants specifically argued that Rhodes had fraudulently joined McDaniel, who like Rhodes is a resident of the state of Tennessee. The Complaint alleges only one cause of action against McDaniel, the IIED claim. According to the Notice of Removal, Rhodes's IIED claim against McDaniel arose out of his employment under McDaniel's supervision and his eventual termination at Bates Rubber. Courts applying Tennessee law have concluded that the emotional distress associated with the terms and conditions of one's employment and even the loss of that employment will not support a claim for IIED. Therefore, Rhodes's attempt to defeat diversity by including a meritless IIED claim against McDaniel should fail, and this Court should accept subject matter jurisdiction over the case.

The merit of Rhodes's IIED claim has been the subject of several post-removal motions filed by the parties. Soon after the removal of the case to federal court, McDaniel filed a Rule 12(b)(6) motion to dismiss (ECF No. 7) in which she argued that the Complaint failed to state an IIED claim against her. For his part, Rhodes filed a motion to remand (ECF No. 19) the case back to state court, also focused on the merits of his IIED pleadings. Rhodes argued that he had alleged a colorable IIED claim against McDaniel and that there was not complete diversity of citizenship among the parties.

4

In a separately issued order, the Court held that Rhodes had not alleged enough facts to show that McDaniel's conduct met the test for outrageousness under Tennessee law. Without allegations to make out this essential element of his IIED claim, Rhodes did not have a colorable claim against McDaniel. The Court denied Rhodes's motion to remand, dismissed McDaniel as a party to the action, and denied her Rule 12(b)(6) motion as moot.

This leaves the Employer Defendants' Motion to Dismiss in which they argue, in part, that the Complaint fails to state a plausible IIED claim against them. Just as they did in their Notice of Removal and in their opposition to the motion to remand, the Employer Defendants argue that the Complaint fails to allege that McDaniel or any other Employer Defendant engaged in outrageous conduct. And just as he did in support of his motion to remand, Rhodes argues that his Complaint plausibly alleges an IIED claim against McDaniel and the Employer Defendants. With specific reference to the Employer Defendants, Rhodes asserts that an employee may hold his employer liable for IIED where the employer ignores an ongoing pattern of harassment in the workplace.

The other issue raised in the Employer Defendants' Motion to Dismiss is Rhodes's claim for punitive damages for the violation of the THRA. The Employer Defendants argue that the Tennessee Supreme Court has held the THRA permits punitive damages only in cases of housing discrimination and malicious harassment. Punitive damages are not available in age discrimination cases. Rhodes counters that based on the Sixth Circuit's recent decision in *Lindenberg v. Jackson National Life Insurance Company*, 912 F.3d 348 (6th Cir. 2018), punitive damages are available in age discrimination cases, and a jury is required to decide any claim for punitive damages as a question of fact. In their reply brief, the Employer Defendants note that the right to a jury trial in Tennessee is guaranteed only to the extent that it existed under North Carolina common law at the time of the Tennessee Constitution's adoption in 1796. The THRA, which the Tennessee Legislature enacted in

5

1978, does not implicate the common law right to a jury trial discussed in *Lindenberg*. As such, the Court should dismiss Rhodes's prayer for punitive damages.

## STANDARD OF REVIEW

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992). However, legal conclusions or unwarranted factual inferences need not be accepted as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim." *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 681 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). *See also Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (quoting *Twombly,* 550 U.S. at 555). In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

The Court holds that the Complaint fails to state a plausible claim for IIED or punitive damages against the Employer Defendants. The Court will discuss each issue separately.

**I. Intentional Infliction of Emotional Distress**

To make out a claim for IIED in Tennessee, a plaintiff must show that: (1) the conduct complained of was intentional or reckless, (2) the conduct is so outrageous that it is not tolerated by a civilized society, and (3) the conduct resulted in serious mental injury. *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 31 (Tenn. 2005) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). The Tennessee Supreme Court has remarked that a plaintiff seeking damages for IIED must meet "an exacting standard," one which requires a plaintiff to prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). The threshold determination of "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery" is a question for the court. *Bain*, 936 S.W.2d at 623 (citing *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966)).

The Complaint can be read to assert two distinct theories of recovery against the Employer Defendants for the intentional infliction of emotional distress. Rhodes first alleges that the Employer Defendants are vicariously liable for Pamela McDaniel's outrageous conduct. *See* Compl. ¶ 133 ("Under the doctrine of *respondeat superior* Employer-Defendants are vicariously liable for the intentional, malicious, outrageous acts of their servant, employee, and agent, Defendant Pamela McDaniel . . . ."). It is undoubtedly true that a plaintiff may hold an employer vicariously liable for the tortious conduct of its employee for acts the employee committed in the course and scope of her employment. *Heflin v. Iberiabank Corp.*, 571 S.W.3d 727 (Tenn. Ct. App. 2018) (citations omitted). However, the Court has held in denying Rhodes's motion to remand that the Complaint did not allege

7

a colorable IIED claim against McDaniel. If Rhodes has no IIED claim against McDaniel, it follows that Rhodes cannot hold the Employer-Defendants vicariously liable under a *respondeat superior* theory for McDaniel's outrageous conduct. Therefore, the Employer Defendants are entitled to the dismissal of Rhodes's IIED claim against them under a *respondeat superior* theory.

Rhodes's second theory of relief would hold the Employer Defendants liable for their own independent outrageous conduct, conduct which took three forms: (1) condoning McDaniel's harassment of Rhodes, (2) ratifying McDaniel's decision to terminate Rhodes's employment for pretextual reasons, and (3) opposing Rhodes's application for unemployment benefits on false pretenses. But none of these allegations state a plausible IIED claim or satisfy the heightened burden under Tennessee law to show extreme or outrageous conduct. Allegations that the Employer Defendants condoned McDaniel's workplace conduct and ratified her pretextual decision to terminate Rhodes bear a striking resemblance to the Complaint's allegations of vicarious liability. Be that as it may, the Sixth Circuit has suggested what might be called an employer inaction theory of liability for IIED in Tennessee: "[i]naction by an employer, or another actor in a position to exercise control, in the face of continuous, deliberate, degrading treatment of another may rise to the level of intentional infliction of emotional distress." *Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933, 947 (6th Cir. 2000), *rev'd on other grounds*, 542 U.S. 842 (2001). In *Pollard*, the plaintiff had adduced proof of "unusually egregious" conduct amounting to a "type of slow torture" based on a record of "daily, consistent harassing behavior which [the employee] endured over a period of months and years" from co-workers. Rhodes has not alleged the existence of such a work environment here. And even assuming there is a legal distinction between mere vicarious liability and condoning or failing to intervene in unlawful employment actions, the Court holds that Rhodes has not alleged enough facts to hold the Employer Defendants liable under an inaction theory.

8

This leaves the Complaint's allegations about the Employer Defendants' opposition to Rhodes's application for unemployment benefits and his precarious financial circumstances after his termination. Rhodes alleges that the Employer Defendants appealed the state of Tennessee's decision to grant Rhodes unemployment benefits and during those proceedings falsely maintained that Rhodes was fired for misconduct. *See* Compl. ¶¶ 104, 128, 131. Because the Employer Defendants did not offer Rhodes severance or the value of his accrued vacation and Rhodes was not old enough to draw Social Security, Rhodes alleges that the Employer Defendants' opposition to his receiving unemployment benefits was outrageous. *Id.* ¶ 105.

The Court finds that Rhodes has plausibly alleged how his job loss undermined his financial standing, which in turn caused him emotional distress. However, an IIED claim based the economic harm occasioned by the loss of a job, even where the employer has acted unlawfully to terminate the employee or vexatiously to oppose the former employee's bid for unemployment relief, "would result in every discrimination claim also being an outrageous conduct claim." *Collins v. Memphis Goodwill Indus., Inc.*, 489 F. App'x 901, 910 (6th Cir. 2012) (citing *Bellomy v. AutoZone, Inc.*, No. E2009–00351–COA–R3–CV, 2009 WL 4059158, at *11 (Tenn. Ct. App. Nov. 24, 2009)). While these kinds of harms do not make out an IIED claim in a run-of-the-mill employment discrimination case, they are precisely the kinds of injuries for which a plaintiff can recover damages under the THRA. "The remedies provision of the THRA is designed to provide a [discrimination] victim with a full recovery, which includes damages for humiliation and embarrassment as well as damages for economic loss." *Anderson v. Save-A-Lot, Ltd.*, 989 S.W.2d 277, 290 n.10 (Tenn. 1999) (citing Tenn. Code Ann. § 4–21–306(a)(7) & (8)). And to the extent that the facts alleged suggest indifference or perhaps malice on the part of the Employer Defendants, even malicious conduct does not satisfy the high standard for outrageousness. *Leach v. Taylor*, 124 S.W.3d 87, 92 (Tenn. 2004) (quoting Restatement (Second) of Torts § 46)). All of this is to say, Rhodes has alleged a paradigmatic case of employment

9

discrimination but nothing to show that his is the extraordinary case that would also make out a claim of IIED.

Moreover, Rhodes has cited no authority to show that an employer's mere opposition to an application for unemployment makes out a plausible IIED claim. *See Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988, 1023 (N.D. Ill. 2014) (holding that an employer's opposition to a former employee's application for unemployment do not meet Illinois's test for IIED). Taken as a whole, the pleadings only show that Bates Rubber initially contested Rhodes's right to receive unemployment but did not actually alter the outcome of his unemployment case. The exhibits attached to the Complaint suggest Rhodes ultimately prevailed and received his benefits, despite the Employer Defendants' opposition. In a letter addressed to Rhodes dated October 29, 2018, the Tennessee Department of Labor and Workforce Development advised Rhodes that he was entitled to unemployment benefits. *See* Collective Ex. N, Compl. (ECF No. 1-2, Page ID 105.) The letter specifically stated that the agency had found no evidence Rhodes was guilty of misconduct and rejected Bates Rubber's claim that Rhodes had violated company policy. *Id*.

While it is true that Bates Rubber appealed the initial determination, Collective Exhibit N suggests two additional material facts: (1) Rhodes was entitled to receive his benefits immediately, even during the pendency of the appeal; and perhaps more important, (2) Bates Rubber subsequently withdrew its appeal. According to the initial letter advising Rhodes that the state had approved his application for benefits, Rhodes was entitled to receive benefits effective October 7, 2018, which was only the third day after his suspension. *Id*. Bates Rubber appealed the initial decision but then dropped its appeal in a letter dated January 10, 2019. *Id*. at Page ID 124. The upshot of the proof is that Rhodes was granted unemployment benefits, and nothing about Bates Rubber's opposition at the administrative level interrupted or prevented him from receiving his benefits. The fact then that Rhodes received unemployment and that Bates Rubber dropped its opposition during the course of

the proceedings further weakens any possible inference that the Employer Defendants acted outrageously. For all of these reasons, the Court concludes that the Complaint fails to state an essential element of the IIED claim against the Employer-Defendants. Therefore, the Employer Defendants' Motion to Dismiss is **GRANTED** as to the IIED claim.

**II. Punitive Damages for Violations of the THRA**

Next, the Employer Defendants seek the dismissal of Rhodes's prayer for punitive damages for the alleged violation of the THRA. The Complaint includes an *ad damnum* for $15 million in punitive damages based on the Employer Defendants' acts of age discrimination. The THRA makes it "a discriminatory practice for an employer to . . . discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4–21–401(a)(1). The Tennessee Supreme Court has construed the THRA to permit the recovery of punitive damages "only in cases involving discriminatory housing practices and malicious harassment." *Carver v. Citizen Utils. Co.*, 954 S.W.2d 34, 36 (Tenn. 1997); *Forbes v. Wilson Cnty. Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 422 (Tenn. 1998); *see also Baker v. Windsor Republic Doors*, 635 F. Supp. 2d 765, 772 (W.D. Tenn. 2009). As a federal court sitting in diversity, this Court is "bound by [these] controlling decisions" of the Tennessee Supreme Court. *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 364 (6th Cir. 2018) (citations omitted). The *Carver* and *Forbes* decisions preclude a claim for punitive damages based on a violation of the THRA's anti-discrimination provision and entitle the Employers Defendants to the dismissal of Rhodes's prayer for punitive damages.

Nevertheless, Rhodes argues that the THRA's bar on the recovery of punitive damages impairs his right to a jury trial under the Tennessee Constitution. For support Rhodes relies on the Sixth Circuit's decision in *Lindenberg v. Jackson National Life Insurance Co.*, 912 F.3d 348 (6th Cir.

2018) where the Court of Appeals held that "the statutory cap on punitive damages set forth in [Tenn. Code Ann.] § 29–39–104 violates the Tennessee Constitution," specifically Article I, § 6's guarantee of the right to trial by jury. *Lindenberg*, 912 F.3d at 370. Prior to *Lindenberg*, Tenn. Code Ann. § 29–39–104(a)(5) limited the recovery of "punitive or exemplary damages" in a civil action to two times the amount of compensatory damages awarded or $500,000, whichever sum was greater. Tenn. Code Ann. § 29–39–104(a)(5). At trial a jury had awarded the plaintiff in *Lindenberg* $350,000 in compensatory damages representing the proceeds of a life insurance policy; $87,500 in damages for the defendant-insurance company's bad faith refusal to pay the policy; and $3 million in punitive damages based on a finding that the insurance company's refusal was intentional, reckless, malicious, or fraudulent. *Lindenberg*, 912 F.3d at 354–55. The district court reduced the punitive damages award to $700,000, or twice the amount of the compensatory damages, as required by Tenn. Code Ann. § 29–39–104(a)(5). *Id*.

On appeal, the Sixth Circuit reasoned that the Tennessee Constitution's right to a jury trial included the right to have a jury decide a common law claim for breach of contract and an award of punitive damages for the breach of contract. The Court of Appeals reached its conclusion after a detailed historical analysis of "the right to trial by jury as it existed at common law under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796." *Id*. at 364 (quoting *Young v. City of LaFollette*, 479 S.W.3d 785, 793 (Tenn. 2015)). The historical record showed that at common law, the right to a trial jury "would have included the right to have the jury award punitive damages in appropriate cases" and "that the proper measure of punitive damages is historically a 'finding of fact' within the exclusive province of the jury." *Id*. at 365 (citations omitted). The Sixth Circuit held then that the statutory cap on an award of punitive damages invaded the province of the jury and violated the constitutional right to jury trial in Tennessee.

But the statutory cap at issue in *Lindenberg* has no bearing on Rhodes' prayer for punitive damages under the THRA. In fact, *Lindenberg* did not address the THRA at all or the right to have a jury decide the question of punitive damages for violations of the Act. Rhodes, in effect, asks the Court to extend the holding and reasoning of *Lindenberg* and conclude that any limitation on his right to recover punitive damages for violations of the THRA is unconstitutional. Nothing in *Lindenberg* supports the notion, however, that punitive damages are available in all civil actions or that all claims for punitive damages must be tried to a jury. On the contrary, *Lindenberg* specifically acknowledged that the Tennessee Constitution "does not guarantee the right to a jury trial in every case," only in those cases where the right existed at common law in 1796. *Id. Lindenberg* was concerned with the constitutional right to a jury trial on a common law cause of action (breach of contract) and remedy (an award of punitive damages in appropriate cases for breach of contract). *Id*. at 362 (noting that Tennessee common law permits the recovery of punitive damages for breach of contract on "clear and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously, or recklessly.'") (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012)).

By contrast, Rhodes asserts a constitutional right to have a jury make findings of fact and award punitive damages on a statutory cause of action, the violation of the THRA. Tennessee decisional law forecloses such an argument. The Tennessee Supreme Court has held that "the constitutional right to trial by jury does not apply to statutory rights and remedies created after the adoption of the 1796 Constitution." *Young*, 479 S.W.3d at 793–94. This obviously includes the THRA: Tennessee enacted the THRA in 1978, 182 years after the ratification of the Constitution of 1796. *See Sneed v. City of Red Bank, Tennessee*, 459 S.W.3d 17, 26 (Tenn. 2014). For statutory claims like Rhodes's THRA claim, "the Legislature is free either to dispense with the right of trial by jury or provide for it." *Id*. (internal citations omitted). As already noted, the Tennessee Supreme Court has construed the THRA to bar an award of punitive damages for violations of the Act's anti-

13

discrimination section.  In other words, the Tennessee legislature has not only dispensed with the right to have a jury hear the issue of punitive damages; it has dispensed with the remedy altogether.  Simply put, the THRA's limitation on the availability of punitive damages does not implicate Rhodes's constitutional right to a jury trial.  Therefore, the Defendant Employers' Motion to Dismiss is **GRANTED** as to Rhodes's prayer for an award of punitive damages for the alleged violation of the THRA.

## **CONCLUSION**

The Complaint fails to state a plausible IIED claim against the Employer Defendants or a claim for punitive damages based the Employer Defendants' alleged violations of the THRA.  The Employer Defendants' Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED.**

        **s/ S. Thomas Anderson**
        S. THOMAS ANDERSON
        CHIEF UNITED STATES DISTRICT JUDGE

Date:  June 26, 2019.